**Gary Gene GANN, et al.,
Plaintiffs-Appellants,**

v.

**INTERNATIONAL HARVESTER
COMPANY OF CANADA, LTD.,
et al., Defendants-Appellees.**

Supreme Court of Tennessee,
at Knoxville.

June 2, 1986.

Bruce A. Anderson, McCampbell & Young, Joseph B. Yancey, Yancey, Webb, Jackson & Merriman, Knoxville, for plaintiffs-appellants.

Robert R. Campbell, Hodges, Doughty & Carson, L. Anderson Galyon, III, Kennerly, Montgomery & Finley, Knoxville, for defendants-appellees.

## OPINION

FONES, Justice.

This is a products liability case wherein plaintiff contends that the International Harvester Crawler Tractor which he was operating when it rolled over and severely injured him, was defective and unreasonably dangerous because it did not have a roll-over protective structure [ROPS] and a seat belt.

The trial judge submitted the case to the jury after overruling motions for directed verdicts by the manufacturer and the dealer. The jury could not agree upon a verdict and a mistrial was declared. Thereafter the trial judge sustained defendants' motion for directed verdicts and dismissed the complaint, as authorized in T.R.C.P. 50.02. The Court of Appeals affirmed, finding that plaintiff had failed to prove that the tractor left the seller's hands in a defective condition, and unreasonably dangerous to the consumer, as those terms are defined in Section 402A of the Restatement 2d, Comments (g) and (i). We are of the opinion that plaintiff's proof was sufficient to require submission of that issue to the jury and therefore reverse.

Plaintiff continues to insist that we should overrule long-standing precedent in this State involving the elements that are the necessary prerequisites to the application of the doctrine of collateral estoppel and thus grant plaintiff a summary judgment on the issue of liability. Plaintiff predicates this insistence upon the case of *Wagner v. International Harvester Co.*, 611 F.2d 224 (8th Cir.1979). In that case a Minnesota jury found International Harvester liable for failure to install a ROPS as standard equipment on the same type of crawler tractor involved in this case. The Court of Appeals correctly dealt with that issue, citing the absence of the requirement of identity of parties mandated in *Cole v. Arnold*, 545 S.W.2d 95 (Tenn.1977). In addition, we find it completely untenable to sanction a result that would allow a jury in Minnesota to establish as a matter of law in Tennessee the standard for determining a product's defective condition and the standard for determining whether it is unreasonably dangerous to a Tennessee consumer, "who purchases it, with the ordinary knowledge common to the community as to its characteristics." Section 402(A) Restatement 2d, comment (i).

### I.

In September, 1972, one Quillen purchased an International Harvester 500C

Crawler Tractor from defendant Power Equipment Company for use on his farm in Jefferson County, Tennessee. International Harvester offered a ROPS as optional equipment at that time and the salesman informed Quillen of the price but Quillen declined to purchase it. In February, 1973, International Harvester began including a ROPS as standard equipment on the 500C Crawler Tractor. The price for the ROPS offered to Quillen was $445 but he told the salesman that he could put one on for less money.

The Gann family farm was adjacent to the Quillen farm and at the time of the accident in January 1977, Gary Gann's father was operating both farms. Gary was almost seventeen years of age and had operated the 500C Tractor forty to fifty hours, spreading fertilizer, grading roads and bush-hogging. He knew the tractor would turn over on steep slopes and that there were some places on the farm too steep for safe operation of the tractor. He also knew that if the tractor turned over the driver would likely be seriously hurt. Gary's cousin, Garland Gann, instructed him in the operation of the tractor. Garland had worked on the Gann farm for more than twenty years and testified that, after the 500C Tractor was delivered to the farm, he told Quillen that it should have some roll over protection on it.

On January 31, 1977, Gary Gann and a friend, Terry Henry, went to the barn to check on the feed for the cows. They found that two calves had frozen to death and to bury them Gary had to drive the 500C Tractor out of the barn and hitch a wooden sled behind it. To reach the location of the sled from where the tractor was located in the barn, Gary had to drive out of the barn, turn 180° and drive over what was referred to at the trial as the "vehicle path" along the outside of the barn. The barn was located on the crest of a hill and it, and the vehicle path that came up from the valley and ran along side of it, were on ground that was almost level with only a slight slope. Beyond the vehicle path the slope of the hill gradually increased to a steep slope where the cows had made trails walking perpendicular to the direction of the slope. Vegetation covered the hill except for some bare ground visible in the two tracks of the vehicle path.

Just as Gary cleared the opposite end of the barn from the exit, the tractor began to slide sideways away from the barn on the frozen ground, and when it reached the steep slope where the cow trails were, it turned over with Gary still in the driver's seat. He testified that it happened so fast he had no chance to jump clear of the tractor. Gary did not know that the ground was frozen. Garland Gann went to the scene of the accident shortly after it happened and testified that the ground did not appear to be frozen, and that he would have had no hesitation in driving the tractor over the vehicle path as Gary had done.

Gary's left arm was severed at the shoulder and his right hand was so badly mangled it had to be amputated. He had severe internal injuries, lost a great deal of blood and contracted hepatitis.

## II.

Plaintiff presented three expert witnesses, a professor of mechanical engineering, a consulting safety engineer and an engineer who had worked for International Harvester for more than twenty years, Earnest Carlson. All three testified about the awareness that existed in the nineteen sixties and earlier of the danger of serious injury or death when tractors rolled over, the recommendations of professional societies that tractors be equipped with ROPS and safety belts, and the frequency of such accidents. The record reflects that the International Harvester Farm Magazine reported that in 1969 farm accidents caused 7,000 deaths, 600,000 injuries and two billion dollars in financial losses. The article continued as follows:

"Machinery-related accidents account for almost 42% of all injuries and deaths. And nearly half of those involved tractor overturns, a strong argument for protective frames."

Thus, roll-over farm accidents accounted for 14,070 deaths and 126,000 injuries in 1969, a rate per day of 4 deaths and 345 injuries.

The experts expressed the opinion that the 500C Crawler Tractor was defective and unreasonably dangerous without a ROPS and a seat belt. Doctor Richardson, the professor, testified that a warning of the hazard was insufficient, but should have been given in the absence of the ROPS and seat belt, and that he had examined the operator's manual and found no warning. The safety engineer testified that offering a ROPS as optional equipment was insufficient; that in effect the average consumer did not recognize the hazard.

Mr. Carlson testified that while employed by International Harvester he was chairman of the industrial section of a trade association of manufacturers of farm and industrial equipment. He testified about his committee's efforts to formulate a standard for safe roll-over protective structures in the nineteen sixties. Mr. Carlson authored an article that was published in the National Safety News in March, 1968, entitled "Tractor Roll Over Frames." The article reviewed Carlson's committee's work in gathering statistics and its efforts to promote inclusion of a safe structure to reduce death and injuries in the event of tractor roll-over accidents. Carlson clearly indicated in the article that it was generally known in the industry, prior to 1968, that roll-overs involved a very great risk of serious injury or death to operators if the tractor was not equipped with a protective structure and seat belt. The article concluded with the following comment:

> "[a]s far as tractor operations are concerned, there is common agreement that some type of sturdy structural frame enclosing the operator will considerably reduce fatalities and injuries when accidental tractor upsets occur."

Mr. Carlson also testified as follows:

> "Q. When you were a design engineer for International Harvester, did you rely on the fact that the consumer would discover and understand the hazards that were involved in the use of a particular product that you may be designing?
>
> A. Well, a roll of a piece of equipment like that is such an insidious thing that unless you really have experience with it, unless you have done something with it you have the attitude, it can't happen to me, anyway. But you don't understand what is involved and what causes a roll. And most people think that a roll only occurs on a very steep hill and that is not true. Rolls have occurred on relatively flat ground given the proper conditions."

Mr. Carlson expressed the opinion that the 500C Crawler Tractor was defective and unreasonably dangerous without a ROPS as standard equipment; that offering a ROPS as optional equipment was insufficient. With respect to warnings he testified as follows:

> "A. I don't think a warning is sufficient. This hazard and this risk is too great and I know, in my case, I don't necessarily read warning signs. You have to have the frame in place and you have to really educate a person to convince him that rolls can and will happen on relatively flat ground. A warning is not sufficient in my opinion."

### III.

The parties and the lower courts are in agreement that this case is governed by the law of strict liability in tort and that the strict liability rule adopted in Tennessee is as stated in 2 Restatement Torts § 402A.[1] *See Ford Motor Company v. Lonon,* 217 Tenn. 400, 398 S.W.2d 240 (Tenn.1966) and *Ellithorpe v. Ford Motor Co.,* 503 S.W.2d 516 (Tenn.1973). Section 402A imposes liability upon one who sells a product in a defective condition unreasonably dangerous to the user or consumer or to his property. "Defective condition" and

---

1. The Tennessee Products Liability Act of 1978 has no application to this suit, the accident having occurred prior to its enactment.

"unreasonably" dangerous are defined in comments (g) and (i) of section 402A as follows:

> g. *Defective condition.* The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him. The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed. The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained.

> Safe condition at the time of delivery by the seller will, however, include proper packaging, necessary sterilization, and other precautions required to permit the product to remain safe for a normal length of time when handled in a normal manner.

> . . . .

> i. *Unreasonably dangerous.* The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by "unreasonably dangerous" in this Section. The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fusel oil, is unreasonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous.

The definitions in comments (g) and (i) are referred to as the "consumer expectation" test. That test has been criticized by text writers and in opinions from our sister states. It is said that it is based on the assumption that the ordinary consumer knows what he is buying when in fact the consumer does not have adequate information upon which to base his expectations. In a design defect case, it is said that the consumer would not know what to expect because he or she would have no idea how safe the product could be made.

In design defect cases some jurisdictions have adopted the risk-utility test, while others have adopted the reasonably prudent manufacturer test. *See, e.g., Cepeda v. Cumberland Engineering Co., Inc.,* 76 N.J. 152, 386 A.2d 816 (1978); *Suter v. San Angelo Foundry and Machine Co.,* 81 N.J. 150, 406 A.2d 140 (1979); *Phillips v. Kimwood Machine Co.,* 525 P.2d 1033 (1974); *Ryder v. Kelly-Springfield Tire,* 91 Wash.2d 111, 587 P.2d 160 (1978). California eliminated the unreasonably dangerous requirement in design defect cases in *Cronin v. J.B.E. Olson Corporation,* 104 Cal. Rptr. 433, 501 P.2d 1153 (1972) and promulgated its own definition of defective in *Barker v. Lull Engineering Co.,* 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978). The courts differ on whether the focus should be on the condition of the product, or on the manufacturer's conduct, or on the manufacturer's knowledge or the constructive knowledge, or the consumer's knowledge, or various combinations thereof. In short, it is an area of law characterized by much confusion and little agreement. For a discussion of the various tests applied by the courts in design defect cases, see

Wade, On Product "Design Defects" and Their Actionability, 33 Van.L.Rev. 551, and Birnbaum, Unmasking the Test for Design Defect: From Negligence (to Warranty) to Strict Liability to Negligence, 33 Van.L. Rev. 593.

■ However, as indicated, the tests for determining what products are defective and unreasonably dangerous in Tennessee are those prescribed in comments (g) and (i) to 402A of the Restatement Second. In this case the test may be stated as whether the danger posed by the absence of a ROPS and a seat belt was beyond that expected by an ordinary consumer with the ordinary knowledge common to the community as to the characteristics of a 500C Crawler tractor.

■ We find that there was proof on behalf of plaintiff that the ordinary consumer throughout the United States lacks knowledge that roll-overs occur on relatively flat ground, and lacks knowledge of the number of roll-overs that occur in farm operations. This accident occurred on a vehicle path that has been used many times by Gary Gann and Garland Gann, that was almost level, and the terrain of the vehicle path appeared normal on the date of the accident. Gary testified that the only experience he had encountered where the tractor slid was on slate rock and in mud; that he was not aware that the ground was frozen on the day of the accident. Garland Gann testified that he would have driven the tractor over the vehicle path that day; that it looked safe to him. It may be inferred from the testimony of Gary and Garland that if they had known the ground was frozen they would not have recognized or expected any danger of roll-over from that condition, on ground as nearly level as the vehicle path was.

■ It is settled law in this State that upon defendant's motion for a directed verdict, the Court must take the strongest legitimate view of the evidence in favor of plaintiff, allow all reasonable inferences in plaintiff's favor, discard all countervailing evidence and deny the motion, unless the minds of reasonable men could draw only one conclusion and that favorable to defendant. *See Holmes v. Wilson,* 551 S.W.2d 682, 685 (Tenn.1977). We are of the opinion that the evidence in this case required submission to the jury on the issue of whether defendants sold the product in a defective and unreasonably dangerous condition in failing to include a ROPS and a seat belt as standard equipment.

■ Defendant insists that the directed verdict was proper because the lack of a ROPS was admittedly obvious, a patent defect, and because the danger of serious injury from roll-overs and the danger of roll-overs on steep slopes was known by the ordinary user and by both Gary and Garland Gann. Thus, defendant says there was no danger beyond the knowledge of the ordinary consumer in that community. There are two answers to that contention. First, defendant's premise simply fails to take into consideration the two elements of danger that a jury could find were beyond the knowledge of the ordinary consumer: the likelihood of a roll-over on near level ground, as actually occurred here, and the frequency of tractor roll-over accidents on farms. Second, defendant's contention seeks to impose on the strict liability law of Tennessee the "patent danger rule." That rule was adopted in New York and later overruled. *See Campo v. Scofield,* 301 N.Y. 468, 95 N.E.2d 802 (1950), and *Micallef v. Miehle Co.,* 39 N.Y.2d 376, 348 N.E.2d 571 (1976). That rule relieves the manufacturer of liability for patently dangerous defects, imposing only a duty to make a product free from latent defects and concealed dangers. Such a rule would conflict with our holding in *Ellithorpe v. Ford Motor Co., supra,* that although the defense of assumption of the risk is available in Tennessee it must be shown that the plaintiff, (1) discovered the defect, (2) fully understood the danger it presented, and (3) disregarded this known danger and voluntarily exposed himself or herself to it. 503 S.W.2d at 522. The burden of establishing those requirements is on the defendant, whereas under the patent danger rule the defendant would not be required to prove that the plaintiff was aware of the danger presented and voluntarily exposed himself or herself to it.

The majority of jurisdictions have rejected the patent danger rule and hold that the obviousness of the defect is only a factor to be considered by the jury as a mitigating defense in their determination of whether a defect is unreasonably dangerous.

We find that *Orfield v. International Harvester*, 535 F.2d 959 (6th Cir.1976), provides no authority applicable to the disposition of this case. It appears that the proof in that case was undisputed that ordinary consumers knew and appreciated the danger involved in windrowing trees in a bulldozer without a canopy. The unreported case of the Court of Appeals cited by defendant is likewise clearly distinguishable on its facts.

The judgment of the Court of Appeals is reversed and this case is remanded to the Circuit Court of Knox County for a new trial. Costs are adjudged against defendant.

BROCK, C.J., COOPER and HARBISON, JJ., and BYERS, Sp.J., concur.