826 F.2d 1507
 Prod.Liab.Rep.(CCH)P 11,521
David CANSLER, Plaintiff-Appellee,
v.
GROVE MANUFACTURING COMPANY, Defendant-Appellant.
 No. 86-5588.
 United States Court of Appeals,
Sixth Circuit.
 Decided Aug. 19, 1987.
 Rehearing Denied Sept. 24, 1987.
Rehearing and Rehearing En Banc Denied Oct. 14, 1987.
 
 Barry K. Maxwell, Egerton, McAfee, Armistead, Davis, Knoxville, Tenn., Donald F. Paine, William P. Newkirk, for defendant-appellant.
 Charles R. Terry, Morristown, Tenn., Beverly Carol Sullivan, J. Ronnie Greer, Greeneville, Tenn., Jerry J. Phillips, Knoxville, Tenn., for plaintiff-appellee.
 Before ENGEL, KRUPANSKY and GUY, Circuit Judges.
 KRUPANSKY, Circuit Judge.
 
 
 1
 Defendant-appellant Grove Manufacturing Company (Grove) appealed from the district court's order denying its motion for judgment notwithstanding the verdict or, in the alternative, a new trial following a jury verdict in favor of plaintiff-appellee David Cansler (Cansler) in this products liability action commenced under Tennessee law.
 
 
 2
 The record disclosed the following facts. In 1983, Cansler's employer, Greenville Erection and Excavating Company (Greenville), was awarded a contract to sandblast a steel structure in Sullivan County, Tennessee. To complete the work under the contract, Grove intended to use a 1979 Grove TMS-300LP35 ton hydraulic truck crane (crane). Greenville had purchased the crane in "used" condition in the spring of 1983 and was provided with an "Operator and Safety Handbook" (handbook) detailing the operation and erection of the crane.
 
 
 3
 The "boom" of the crane was sufficient in length to accommodate most of the work performed by Greenville, but was, however, equipped with a 32 foot boom extension for use on occasions when a longer boom was required. When not in use, or in the "stowage position," the extension was stored alongside the boom and was held there by a "rear latch" and two "front support bracket" or "stowage" pins. To lengthen the boom, the extension was swung 180 degrees and locked in place for use. As described by the district court, the process was much like "unfolding a pocket knife which is lying on its side."
 
 
 4
 The process of erecting the extended boom was detailed in the "Operator and Safety Handbook" which contained the following definition in its preface:
 
 WARNING
 
 5
 A WARNING IS USED TO EMPHASIZE THAT IF AN OPERATION, PROCEDURE OR PRACTICE IS NOT FOLLOWED EXACTLY, DEATH OR INJURY TO PERSONNEL MAY RESULT.
 
 
 6
 The handbook then set forth step-by-step instructions for unfolding the boom extension. The boom, with the extension affixed in the stowage position along its side, was swung to the rear and lowered to its minimum elevation. The handbook explicitly warned against the removal of the stowage pins at this point in time:
 
 WARNING
 
 7
 DO NOT REMOVE THE PINS SECURING THE EXTENSION TO THE FRONT SUPPORT BRACKET AT THIS TIME.
 
 
 8
 In addition, adhesive stickers carrying the following message were affixed to the crane at each pin location:CAUTION
 
 
 9
 ALL PINS MUST BE PROPERLY INSTALLED AND SECURED IN PLACE.
 
 
 10
 Thereafter, the rear latch was released, and the boom extension, using the front support bracket and pins as a pivot, was rotated slightly so that the attached fittings on the right side of the nose of the main portion of the boom and the fittings on the left side of the base of the extension were aligned. Two "attach pins" were then installed through the attach fittings securing the extension to the main section of the boom. The boom was raised to a horizontal position, and at that point, the front support bracket pins were removed. The extension, using the attached fittings previously secured by the attach pins as a hinge, was then swung around so that the boom and its extension were fully elongated. Two additional attach pins were installed completely securing the extension to the main section of the boom. After the hoist cables were rigged, the extended boom was ready for operation. Also affixed to the crane within its cab was a sticker setting forth abbreviated instructions on the proper erection of the boom extension.
 
 
 11
 On June 7, 1983, Greenville was prepared to utilize the crane to perform its work under the Shelby County sandblasting contract. Greenville determined that it would be necessary to erect the boom extension for the project, and Cansler's supervisor therefore directed Cansler and several other laborers to assist the crane operator in doing so. The workers began the extension process, but one of the workers, whose identity is unknown, released the rear latch and removed the two front support bracket pins before the first two attach pins were installed. Consequently, the boom extension was totally unsecured by any pins, and it fell on Cansler when the operator began to raise the boom of the crane. Cansler suffered a fractured spine in the accident and was rendered a paraplegic.
 
 
 12
 Cansler commenced this action against Grove in the United States District Court for the Eastern District of Tennessee on May 24, 1985 seeking recovery under several different products liability theories. On December 10, 1985, Cansler and Grove stipulated to the dismissal of all his claims with prejudice except for his products liability claim anchored in strict liability as embodied in Restatement (Second) of Torts Sec. 402A.[1] The parties thereafter consented to trial by jury before a United States Magistrate, and the trial commenced on February 26, 1986.
 
 
 13
 At trial, Cansler attempted to demonstrate that the crane was defective or unreasonably dangerous because the warnings concerning the dangers of erecting the boom extension were inadequate to apprise both himself and the crane operator of the nature and extent of the danger involved in erecting the boom extension, and because Grove failed to install safety devices which would have prevented the accident. Cansler testified that he had never read the crane operator's handbook and that it was never made available to him by Greenville. He did not testify, however, that the "caution" stickers affixed to the crane at each pin location were not clearly visible to him. Furthermore, he testified during his deposition that he was aware, as a matter of common knowledge, that if all pins were removed leaving the extension unsecured, it would fall. He further testified that he did not need to be warned of the danger of the extension falling because he was familiar with the crane and the danger involved in its preparation and operation.
 
 
 14
 Dr. Leighton Sissom (Sissom), Cansler's expert engineering witness, testified that if all instructions had been followed and all warnings been heeded, the accident would not have occurred. There was no evidence to the contrary. Sissom also testified that there were several "safety devices" available at the time the crane was manufactured which could have prevented the accident. These devices included a mirror situated so the crane operator could view the front support bracket and attach pins from his position in the cab of the crane, flashing lights or "buzzers" in the cab to warn the crane operator that the pins were not in place, and an "electronic interlock system" which would have prevented the crane from being moved if the pins were not in place. Sissom stated, however, that the best method of preventing accidents such as the one which had occurred in the case at bar was for the crane operator to conduct a visual inspection of the pins before moving the crane or its boom. The crane operator's handbook directs the crane operator to follow this course of conduct.
 
 
 15
 Grove moved for a directed verdict at the close of Cansler's case-in-chief and again at the close of all the evidence. Both motions were denied. The jury returned a verdict in favor of Cansler and awarded him $1,000,000 plus his stipulated medical expenses, for a total award of $1,065,879.14. Thereafter, Grove moved for judgment notwithstanding the verdict, for a new trial, and for remittur of the jury's damage award, all of which motions were denied by the magistrate. Grove then commenced this timely appeal arguing principally that the district court erred in denying its motions for a directed verdict and for j.n.o.v.
 
 
 16
 On a motion for judgment n.o.v. as on a motion for a directed verdict, the district court must determine whether there was sufficient evidence presented to raise a material issue of fact for the jury. The determination is one of law to be made in the first instance by the district court. The standard for measuring the legal sufficiency of the evidence is the same both on a motion for a directed verdict and on a motion for judgment n.o.v. Furthermore, the standard remains the same when the trial court's decision is reviewed on appeal.
 
 
 17
 O'Neill v. Kiledjian, 511 F.2d 511, 513 (6th Cir.1975) (citations omitted). "A federal court sitting in a diversity case must apply the directed verdict standard of the state whose substantive law governs the action." Rhea v. Massey-Ferguson, Inc., 767 F.2d 266, 269 (6th Cir.1985). In Tennessee,
 
 
 18
 [a] post-trial motion for the entry of judgment in accordance with a motion for a directed verdict made during the trial must be gauged by the usual rules relating to directed verdicts. Those rules require that the trial judge, and the appellate courts, take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence. A verdict should not be directed during, or after, trial except where a reasonable mind could draw but one conclusion.
 
 
 19
 Holmes v. Wilson, 551 S.W.2d 682, 685 (Tenn.1977) (citations omitted). Grove asserted that reasonable minds could draw but one conclusion from the evidence presented during the trial of this cause: that its crane was not defective or unreasonably dangerous within the meaning of those terms as employed in Restatement (Second) of Torts Sec. 402A.
 
 
 20
 Under Tennessee law, a product may be considered defective or unreasonably dangerous if the manufacturer failed to incorporate safety devices, which were available at the time of the product's manufacture and which would have prevented an injury resulting from the use of the product. Gann v. International Harvester Co. of Canada, Ltd., 712 S.W.2d 100 (Tenn.1986). A product may also be considered defective or unreasonably dangerous if the manufacturer failed to provide adequate warnings informing users of dangers involved in using the product. Young v. Reliance Elec. Co., 584 S.W.2d 663, 668-69 (Tenn.App.1979); Gann v. International Harvester Co. of Canada, Ltd., supra. "The warning should be such that if followed it would make the product safe for users," Abbott v. American Honda Motor Co., 682 S.W.2d 206, 210 (Tenn.App.1984), and it must be "calculated to bring home to a reasonably prudent user of the product the nature and extent of the danger involved in using the product." Trimble v. Irwin, 59 Tenn.App. 465, 441 S.W.2d 818, 822 (1968). "A product is not unreasonably dangerous because of failure to adequately warn of a danger or hazard that is apparent to the ordinary user." Tenn. Code Ann. Sec. 29-28-105(d).
 
 
 21
 Under Tennessee law, however, a products liability plaintiff must always prove that the unreasonably dangerous or defective condition was the proximate cause of his injury. "The question then is: Is there material evidence in the record to show that the [product] was defective at the time it left the control of the defendants against whom recovery is sought, and that the defective condition proximately caused the injury to plaintiffs." Browder v. Pettigrew, 541 S.W.2d 402, 405 (Tenn.1976) (citations omitted) (emphasis added). "To establish the liability of the defendant, it was incumbent upon the plaintiffs to prove in addition that the defective condition ... proximately caused the plaintiffs' injuries and damages...." Ricker v. Zinser Textilmaschinen GmbH, 506 F.Supp. 3, 5 (E.D.Tenn.1978).
 
 
 22
 After careful consideration of the record, this court determines that reasonable minds could not have concluded that the alleged unreasonably dangerous or defective conditions of the Grove crane were the proximate cause of Cansler's injuries. To satisfy his burden of proving proximate causation, Cansler was required to establish, at a minimum, that he would not have sustained his injuries had Grove installed available safety devices or provided additional warnings. See Wyatt v. Winnebago Indus., 566 S.W.2d 276, 280 (Tenn.App.1977) ("[T]he circumstances must be such that the injury would not have occurred but for the defect."); Jackson v. Tennessee Valley Auth., 413 F.Supp. 1050, 1055 (M.D.Tenn.1976), aff'd, 595 F.2d 1120 (6th Cir.1979) (per curiam). Cansler failed to introduce any evidence which would have satisfied this burden.
 
 
 23
 Sissom, Cansler's expert engineering witness testified that had Grove's instructions been followed and warnings been heeded, the boom extension could not have fallen and Cansler would not, therefore, have suffered an injury. Furthermore, Cansler testified that he was aware that the boom extension, if the front support bracket pins were removed, would fall and that it was therefore unnecessary to warn him of this danger. Cansler did not testify regarding the actions he would have taken if more "adequate" warnings had been provided. Although Cansler proceeded partially on a theory that the crane operator would not have begun to raise the unsecured boom had additional warnings been given or safety devices installed, he did not present the crane operator as a witness to testify concerning the events that led to the mishap. Furthermore, Sissom testified that a visual inspection of the pin locations by the crane operator prior to any movement of the crane, as recommended in the crane operator's handbook, was the safest way to prevent accidents. There simply was no evidence presented from which reasonable minds could have concluded that Cansler's injuries were proximately caused by the alleged inadequate warnings and absent safety devices.
 
 
 24
 Accordingly, Grove was entitled to judgment as a matter of law in light of the absence of evidence establishing that the alleged defects in the crane were the proximate cause of Cansler's injuries, and the district court, therefore, erred in denying Grove's motions for a directed verdict and for j.n.o.v. The judgment of the district court is REVERSED, and the case is REMANDED to the district court for entry of judgment in favor of the defendant.
 
 
 
 [1]
 Restatement (Second) of Torts Sec. 402A provides:
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule stated in Subsection (1) applies although
 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.