985 F.2d 560
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Carol LYNCH, individually and as surviving spouse of Norman
Lynch, Plaintiff-Appellant and Cross-Appellee,
v.
Joe F. BRYANT, Defendant-Appellee and Cross-Appellant,
and
Humana of Tennessee, Inc., d/b/a Humana McFarland Hospital;
Humana, Inc., Defendants.
 Nos. 91-5667, 91-5683 and 91-6054.
 United States Court of Appeals, Sixth Circuit.
 Jan. 28, 1993.
 
 Before KEITH, KENNEDY and NATHANIEL R. JONES, Circuit Judges.
 PER CURIAM.
 
 
 1
 Carol Lynch brought this wrongful death, negligence, and abandonment action individually and as the surviving spouse of Norman Lynch, against Dr. Joe F. Bryant and Humana of Tennessee, Inc., d/b/a Humana McFarland Hospital, and Humana, Inc. (the parent corporation of Humana of Tennessee, Inc.) (hereinafter collectively referred to as "Defendants"). A jury returned a verdict generally in Lynch's favor.[1] Dr. Bryant filed various post-trial motions, including a motion for a remittitur and for judgment notwithstanding the verdict. It took approximately six years, but the district court granted Dr. Bryant partial relief. Both parties appealed. We affirm the decision of the district court.
 
 I. The Case
 
 2
 At about 4:30 p.m. on June 28, 1983, Carol and Norman Lynch, and their daughter Stella, were injured in a traffic accident. They were transported by ambulance to the Humana McFarland Hospital in Lebanon, Tennessee. Dr. Bryant was the general surgeon on call. He made an initial assessment of Norman, and had him taken to the X-ray room because of an obvious injury to his leg. The X rays revealed a broken leg. Dr. Bryant told Mr. Lynch that he was a general surgeon, and that the injury would require definitive, or long-term care by an orthopedic surgeon. Dr. Bryant provided initial treatment in the form of a posterior splint and medication. Thereupon, Mr. Lynch was admitted to the hospital with written instructions concerning his leg. Since the orthopedic specialist on call at the hospital refused to treat Mr. Lynch, Dr. Bryant attempted to arrange the transfer of Mr. Lynch to the orthopedic staff at three hospitals in Nashville, Tennessee, but was unsuccessful.
 
 
 3
 Mrs. Lynch was also admitted to the hospital due to various cuts, bruises and sprains sustained in the accident. Medication was prescribed for her as well. Stella was released.
 
 
 4
 At 1:30 a.m. on June 29, Dr. Bryant was notified that Mrs. Lynch was in need of pain medication. Dr. Bryant ordered that the necessary drugs be given.
 
 
 5
 During his morning rounds on June 29, Dr. Bryant examined Mr. and Mrs. Lynch. Mr. Lynch's brother, Harrell, and his brother's wife, Mary Lou, arrived early that morning. Dr. Bryant discussed with Norman and Harrell Lynch transferring Norman Lynch to a Virginia hospital for definitive treatment by an orthopedic specialist. Dr. Bryant determined that Mr. and Mrs. Lynch could travel. Thereupon, Dr. Bryant prepared a transfer order and discharge summary outlining the treatment Mr. Lynch had received, and provided for the administration of pain medication during transfer.
 
 
 6
 Mr. and Mrs. Lynch were technically discharged at 11:00 a.m. on June 29, before they had completed arrangements for their transfer. Dr. Bryant attributed this to an administrative foul-up.
 
 
 7
 At any rate, Dr. Bryant was called in to see Mr. Lynch at about 3:00 p.m. on June 29. A hospital administrator sought a second opinion regarding Mr. Lynch's ability to travel. Dr. Bryant ordered further X rays of Mr. Lynch's leg. A second opinion, by Dr. Sam McFarland, confirmed Dr. Bryant's opinion that Mr. Lynch was able to travel.
 
 
 8
 Dr. Bryant checked on Mr. Lynch and allegedly checked on Mrs. Lynch once again at about 8:30 p.m. on June 29, during his customary evening rounds. Mr. and Mrs. Lynch had chosen to spend the night at the hospital.
 
 
 9
 On the morning of June 30, Dr. Bryant again examined Mr. Lynch, and he allegedly examined Mrs. Lynch.
 
 
 10
 Later that day, Dr. Bryant was informed that Dr. Charles W. Miller, an orthopedic surgeon in Charlottesville, Virginia, had agreed to provide Mr. Lynch with definitive care. Dr. Bryant met with Mr. Lynch and informed him that Dr. Miller was anticipating Mr. Lynch's arrival in Virginia.
 
 
 11
 At about 6:00 p.m. on June 30, Mr. and Mrs. Lynch, as well as Stella, were flown to Virginia. Mr. and Mrs. Lynch were admitted to the Martha Jefferson Hospital. Dr. Miller saw them, for the first time, the next morning at about 8:00 a.m. Mrs. Lynch was discharged on July 2, 1983. Norman Lynch suffered a pulmonary embolism and died on July 4, 1983.
 
 II. Procedure
 
 12
 On January 18, 1984, Mrs. Lynch filed a diversity suit in the United States District Court for the Middle District of Tennessee. Individually, Mrs. Lynch sought compensatory and punitive damages for her pain and suffering allegedly due to the treatment of Dr. Bryant, and she sought compensatory and punitive damages because he allegedly abandoned her while she was in medical need. As the representative of her late husband, she sought compensatory and punitive damages for her husband's unnecessary pain and suffering that allegedly resulted from Dr. Bryant's treatment, and she sought compensatory and punitive damages because of Dr. Bryant's alleged abandonment of her husband. Finally, she sought damages from the Defendants for the wrongful death of her husband. She contended that the Defendants' care was negligent and grossly negligent, and constituted abandonment.
 
 
 13
 The trial lasted approximately two weeks. The jury first returned a liability verdict in favor of Mrs. Lynch, individually,[2] finding with regard to the pain and suffering claim that Dr. Bryant's treatment was negligent and grossly negligent and, regarding her abandonment claim, that Dr. Bryant had abandoned her and was grossly negligent in so doing. Concerning Mrs. Lynch's claims as representative of Mr. Lynch, the jury decided that Dr. Bryant's treatment of Mr. Lynch was negligent in that it did result in unnecessary pain and suffering but that the treatment was not grossly negligent. Furthermore, the jury decided that Dr. Bryant did abandon Mr. Lynch and that he was grossly negligent in this respect. Finally, regarding the wrongful death claim, the jury decided that Dr. Bryant's negligent treatment of Mr. Lynch was not the proximate cause of his death.
 
 
 14
 After the jury returned its verdict regarding liability, but before it deliberated with respect to damages, Mrs. Lynch settled with Humana of Tennessee, Inc. The parties agreed that the settlement was to be allocated toward compensatory and punitive damages, but no specific apportionment was delineated in the agreement between Mrs. Lynch's individual claims and her claims as surviving spouse.
 
 
 15
 Before the jury deliberated with respect to damages, the trial court informed the jury that Mrs. Lynch had settled with the hospital. The court allowed evidence of Dr. Bryant's financial condition to be admitted and instructed the jury to determine damages. The jury awarded Mrs. Lynch, individually, $25,000 in compensatory damages and $100,000 in punitive damages; and for her claims as Mr. Lynch's representative, the jury awarded her $75,000 in compensatory damages and $300,000 in punitive damages.
 
 
 16
 Dr. Bryant then filed numerous post-trial motions, including a motion to alter or amend the judgment, a motion for judgment notwithstanding the verdict, and a motion for a new trial or, in the alternative, a remittitur.
 
 
 17
 On April 26, 1991, the trial court concluded that there was no evidence from which a reasonable jury could determine that Dr. Bryant's treatment of Mr. Lynch constituted an abandonment or gross negligence. Thus, it partially granted Dr. Bryant's motion for judgment notwithstanding the verdict with respect to Mrs. Lynch's claims as surviving spouse and accordingly eliminated the jury's award of punitive damages pertaining to these claims. The trial court also noted that the original jury award of compensatory damages to Mrs. Lynch as surviving spouse was intended to compensate for the negligent treatment that resulted in pain and suffering as well as abandonment. Since the court had set aside the abandonment portion of the verdict, it partially granted Dr. Bryant's motion for remittitur by reducing the compensatory damages award for the representative claims from $75,000 to $50,000.
 
 
 18
 The trial court refused to set aside the compensatory and punitive damages awarded Mrs. Lynch in her individual capacity. Neither would it grant Dr. Bryant's request for remittitur regarding those claims. The court concluded that the evidence supported the jury's verdict that Dr. Bryant's negligent treatment of Mrs. Lynch resulted in unnecessary pain and suffering and constituted abandonment, and it concluded that the evidence pointed to gross negligence in both respects. Both parties appealed to this court.
 
 
 19
 On August 21, 1991, the trial court also granted Dr. Bryant's motion to alter or amend the judgment, and it ordered that the jury's award to Mrs. Lynch, for all of her claims, be reduced by the amount that she received in her settlement with the hospital. Mrs. Lynch also appealed this order, and it was consolidated with the other appeals already before this court.
 
 III. The Granted Portion of the JNOV Motion
 
 20
 The first issue that we must address is whether the district court properly granted Dr. Bryant's motion for judgment notwithstanding the verdict with regard to Mrs. Lynch's claims, as Mr. Lynch's representative, for abandonment and gross negligence. In diversity cases, this circuit adheres to the minority rule that state law governs the standard for granting motions for directed verdicts and judgments notwithstanding the verdict. J.C. Wyckoff & Assocs. v. Standard Fire Ins. Co., 936 F.2d 1474, 1482 (6th Cir.1991). Furthermore, when a district court makes a determination of state law, the court of appeals must review that determination de novo, and no form of appellate deference is acceptable when de novo review is compelled. Id. at 1483 (citing Salve Regina College v. Russell, 111 S.Ct. 1217, 1221 (1991)).
 
 
 21
 In Tennessee, the state law clearly delineates the standard for granting judgments notwithstanding the verdict. After taking the strongest legitimate view of the evidence in favor of the opponent of the motion, allowing all reasonable inferences in the opponent's favor, and discarding all countervailing evidence, the court should deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence. Holmes v. Wilson, 551 S.W.2d 682, 685 (Tenn.1977). If reasonable people could draw only one conclusion, which is favorable to the moving party, then the court should grant the motion. See Gann v. International Harvester Co. of Canada, 712 S.W.2d 100, 105 (Tenn.1986). In this case, the district court judge concluded that a jury could not reasonably find a verdict in favor of Mrs. Lynch as Mr. Lynch's representative on the claim of abandonment and the related charge of gross negligence, and we conclude the same.
 
 
 22
 The Tennessee Supreme Court discussed the tort of abandonment in Burnett v. Layman, 181 S.W. 157 (Tenn.1915), where it stated the following:
 
 
 23
 It is well settled that a physician who undertakes the treatment of a case may not abandon his patient until in his judgment the facts justify the cessation of attention, unless he gives to the patient due notice that he intends to quit the case and affords the patient opportunity to procure other medical attendance.
 
 
 24
 Id. at 158. Thus, under Tennessee law, in order to prove the tort of abandonment, the plaintiff must establish (aside from causation and damages) that cessation of attention was not justifiable, and either (1) that the attending physician did not give the patient due notice that he intended to quit the case, or (2) that the physician did not afford the patient the opportunity to procure other medical help.
 
 
 25
 Dr. Bryant first contends that Tennessee Code Annotated § 29-26-115 (1980) governs Lynch's abandonment claims.[3] He claims that this provision requires Lynch to have proven through expert testimony the standard of professional practice, Dr. Bryant's deviation from that standard, and the causal link between the deviation and the injuries of Mr. and Mrs. Lynch. Since, according to Dr. Bryant, Lynch did not carry this burden of proof, the abandonment claims and the related gross negligence must fail.
 
 
 26
 While some jurisdictions require expert testimony on the standards of the profession to establish a claim of medical abandonment, see, e.g., Willard v. Hagemeister, 121 Cal.App.3d 406, 412, 175 Cal.Rptr. 365, 371 (1981), Tennessee courts have apparently never ruled on the issue. Lynch asserts that even if it is determined that Section 29-26-115 does govern abandonment claims, this does not mean that expert testimony is required because expert testimony is not required to prove every malpractice action. Tennessee courts have held that expert testimony is not required in a medical malpractice action where the act of alleged negligence lies within the common knowledge of the laity. See, e.g., Baldwin v. Knight, 569 S.W.2d 450, 456 (Tenn.1978) (holding expert testimony not required to establish doctor's negligence in obtaining medical history of patient's puncture wound when act of alleged malpractice lies within common knowledge of layperson); Runnells v. Rogers, 596 S.W.2d 87, 89-90 (Tenn.1980); Bowman v. Henard, 547 S.W.2d 527, 530-31 (Tenn.1977). Furthermore, other states have held that even when a medical malpractice act, which generally requires expert testimony, governs an abandonment claim, if the claim involves facts that fall within the common knowledge of laypeople, it can be proven without expert testimony. See, e.g., Therrell v. Fonde, 495 So.2d 1046, 1048 (Ala.1986); Levy v. Kirk, 187 So.2d 401, 402-03 (Fla.Dist.Ct.App.1966); Mehigan v. Sheehan, 51 A.2d 632, 633 (N.H.1947).
 
 
 27
 Without holding that Section 29-26-115 governs abandonment claims, we are convinced that, under the facts in this case, the Tennessee Supreme Court would hold that the abandonment claim could be proven without expert testimony because the necessary facts fall within common knowledge. In Maltempo v. Cuthbert, 504 F.2d 325 (5th Cir.1974), the court construed an abandonment claim based on Florida law. A family doctor told family members of a prisoner that he would inquire into some physical complaints that the prisoner had told the family. After calling the jail, he was informed that the jail physician would care for the patient. The family doctor did not follow up on the care provided to the patient, and he did not contact the family to let them know that he would inquire no further. The patient died, and the family sued the family doctor for abandonment. At the trial, the doctor presented expert testimony that his conduct was within the standard of acceptable medical practice, but the court held that the doctor and his witnesses were attempting to tell the court what the law was. "Of course, medical expertise will govern as to standards of treatment or diagnosis. But the facts in this case involve neither.... It had nothing to do with medical skill and learning." Id. at 327.
 
 
 28
 Lynch's claims of abandonment, likewise, did not involve technical or scientific questions regarding medical expertise or diagnosis. The facts necessary to prove whether Dr. Bryant provided due notice of his intent to quit the case and whether he provided opportunity for Mr. and Mrs. Lynch to procure other medical help are discernable from the common knowledge of laypeople.
 
 
 29
 The undisputed facts reveal that Dr. Bryant did not cease his attention to Mr. Lynch's case. He admitted Mr. Lynch to the hospital on the evening of June 28, 1983, gave orders for his care, saw him on the mornings of June 29 and 30, when he made his rounds, and examined him to determine the extent of the swelling and circulation in the injured leg. Indeed, Dr. Bryant participated in the consultation with Dr. McFarland at Mr. Lynch's bedside on the afternoon of June 29, 1983.
 
 
 30
 Even if it was proven that Dr. Bryant did cease giving attention to Mr. Lynch, it is undisputed that Dr. Bryant told Mr. Lynch at the outset, in the emergency room, that he was a general surgeon and would render initial care, but that Mr. Lynch would require the services of an orthopedic surgeon for definitive care. Thus, he put Mr. Lynch on clear notice of his intent to withdraw from the case after providing initial care. Finally, Dr. Bryant did make efforts to arrange for the transfer of Mr. Lynch on the evening of June 28 to the orthopedic staff at three Nashville hospitals, and he talked to Dr. Charles Miller in Charlottesville, Virginia, on June 30, regarding the transfer of Mr. Lynch, writing an order that Mr. Lynch's medical records and X rays be sent with him, along with pain medication for discomfort while traveling. While there were misunderstandings about the arrangements for transfer and transportation, the facts are clear that Dr. Bryant continued to see Mr. Lynch, that he gave Mr. Lynch due notice of his impending withdrawal from the case, and that he provided Mr. Lynch with the opportunity to procure other medical attention before he left the hospital in Lebanon, Tennessee.
 
 
 31
 Therefore, regarding the charge of the abandonment of Mr. Lynch and the gross negligence related to it, we affirm the district court's decision to grant Dr. Bryant's motion for judgment notwithstanding the verdict and conclude that a jury could not reasonably find in favor of Mrs. Lynch as Mr. Lynch's representative on this score.
 
 IV. The Denied Portion of the JNOV Motion
 
 32
 Next, we must address whether the district court properly denied Dr. Bryant's motion for judgment notwithstanding the verdict with regard to Mrs. Lynch's individual claims for pain and suffering, abandonment, and the gross negligence related to each; and her claims as surviving spouse for the pain and suffering resulting from the negligent treatment of Mr. Lynch.
 
 
 33
 First, regarding Mrs. Lynch's claim of abandonment and the gross negligence related to it, Dr. Bryant challenges the district court's denial of his motion to set aside the jury's verdict because Mrs. Lynch allegedly did not prove through expert testimony that she needed additional care and treatment during a "critical stage" of her treatment. Furthermore, he claims that she did not prove through expert testimony that she suffered some compensable injury, which the lack of treatment proximately caused.
 
 
 34
 We have already stated the reasoning behind our conclusion that expert testimony is not always necessary to establish an abandonment claim. We find that expert testimony was not required regarding Mrs. Lynch's individual claim of abandonment and the gross negligence related to it. Both sides presented ample evidence of a disputed nature to warrant the submission of Mrs. Lynch's claim of abandonment and the related issue of gross negligence to the jury, and the acceptance of the jury's determination.
 
 
 35
 Dr. Bryant's attempt to modify the tort of abandonment through the requirement that the patient must prove, again through expert testimony, the need for additional care during a "critical stage" of the patient's treatment is unavailing. The "critical stage" requirement is simply not an element of the tort of abandonment as described by the Tennessee Supreme Court in Burnett. The focus of the court's language in Burnett is simply on the physician's premature withdrawal from the patient's care. If the facts do not justify the cessation of the physician's attention (i.e., the patient still needs treatment), then the doctor has to give the patient due notice and the opportunity to get other medical help.
 
 
 36
 There was undisputed evidence presented at trial that Mrs. Lynch was in need of further treatment. Dr. Bryant conceded at trial that Mrs. Lynch needed to be under the care of a physician and, of course, insisted that he rendered the care, which fact was disputed. Dr. Miller, the physician who accepted Mrs. Lynch for treatment after her transfer to Virginia, also testified that when Mrs. Lynch arrived in Virginia she was still in need of hospital care and treatment. Therefore, it is clear that Mrs. Lynch was in need of further treatment, and this is sufficient to satisfy the language of Burnett.
 
 
 37
 After treating Mrs. Lynch in the emergency room and admitting her to the hospital for observation on June 28, Dr. Bryant gave telephone orders for medication in the early morning hours of June 29. He also saw her when making rounds on the morning of June 29, and thereafter wrote an order for her dismissal and transfer. The proof is disputed as to whether Dr. Bryant saw Mrs. Lynch again before she was transferred on the evening of June 30. He claimed that he continued to see her on rounds, (J.A. at 272-74, 329-30, 335), but the medical records do not reflect any visits, (J.A. at 272-73, 332), and neither Mrs. Lynch nor her sister-in-law, Mrs. Mary Lou Lynch, recalled any further visits, (J.A. at 484). Thus, the evidence was in dispute as to whether Dr. Bryant actually ceased giving attention to the care of Mrs. Lynch. No proof was offered, however, that Dr. Bryant gave due notice to Mrs. Lynch that he intended to quit her case or afforded her the opportunity to procure other medical attention. Dr. Bryant never spoke with Dr. Miller in Charlottesville about the transfer of Mrs. Lynch like he did in the case of Mr. Lynch. (J.A. at 277.)
 
 
 38
 Therefore, we agree with the district court's decision that there was substantial disputed evidence to warrant leaving intact the jury's verdict on Mrs. Lynch's claims of abandonment and the related gross negligence to the jury. The denial of Dr. Bryant's motion for judgment notwithstanding the verdict as to these claims was correct.
 
 
 39
 Regarding the pain and suffering claims of Mrs. Lynch, individually and in her representative capacity, we find that, under the facts of this case, expert testimony was not necessary to establish the negligence of Dr. Bryant because the alleged acts of malpractice lie within the common knowledge of the laity. See Baldwin, 569 S.W.2d at 456; Runnells, 596 S.W.2d at 89-90. The evidence presented was in dispute. The record reflected that Mr. Lynch's brother went to an outside drug store and purchased Tylenol to relieve the pain that his brother and sister-in-law were suffering because the nursing staff took the position that Dr. Bryant had discharged Mr. and Mrs. Lynch, and that they had no authority to give them any pain medication. (J.A. at 458, 561.) Testimony was given that the nursing staff brought the continued presence of Mr. and Mrs. Lynch in the hospital and their medical needs to Dr. Bryant's attention after his discharge orders, but he was unresponsive. (J.A. at 555-56.) Dr. Bryant claimed that he was not made aware of the problem, that the nursing staff misinterpreted his orders relating to discharge and transfer, and that he had not intended to withhold medication. (J.A. at 330-31.) At trial, Nurse Hinkel agreed that the nursing staff should not have interpreted Dr. Bryant's discharge orders as precluding medication. (J.A. at 389-90.) Yet, Nurse Stephenson testified that Nurse Davidson, the charge nurse, told her not to give Mr. and Mrs. Lynch medication because of Dr. Bryant's discharge orders. (J.A. at 584-85.)
 
 
 40
 In the face of such conflicting evidence, the district court was correct in denying Dr. Bryant's motion for judgment notwithstanding the verdict in reference to Lynch's individual and representative claims for pain and suffering, and any gross negligence regarding Lynch's individual claim for pain and suffering.
 
 V. The Motion for Remittitur
 
 41
 Next, we address whether the district court correctly denied Dr. Bryant's motion for remittitur as to the compensatory and punitive damages awarded to Mrs. Lynch for her individual claims. Dr. Bryant asserts that the district court abused its discretion in refusing to remit these awards. Again, his sole basis for this assertion is the alleged failure of Mrs. Lynch to bring forth expert testimony in support of her claims.
 
 
 42
 It is now well-settled that a trial court which deems a jury's award of damages excessive may order the plaintiff to remit a portion of the award or suffer a new trial. Manning v. Altec, Inc., 488 F.2d 127, 130 (6th Cir.1973) (citing Dimick v. Schiedt, 293 U.S. 474 (1935)). A motion for remittitur should only be granted if the award clearly exceeds the amount which, under the evidence in the case, was the maximum that the jury reasonably could find to be compensatory for the plaintiff's loss. In re Lewis, 845 F.2d 624, 635 (6th Cir.1988). Upon examination of the jury's damage awards, an appellate court can only reverse the district court's denial of a motion for remittitur upon a showing of abuse of discretion. Id. at 635-36. We find no such abuse here.
 
 
 43
 The jury awarded Mrs. Lynch $25,000 in compensatory damages for the pain and suffering she suffered from the negligent treatment and abandonment by Dr. Bryant and she received $100,000 in punitive damages for the gross negligence of Dr. Bryant related to the pain and suffering and abandonment claims. As has been previously stated, the disputed evidence was sufficient for a jury to conclude that Mrs. Lynch unnecessarily suffered pain from the negligent treatment and abandonment by Dr. Bryant. We agree with the district court that the jury's award of $25,000 in compensatory damages was not excessive.
 
 
 44
 Under Tennessee law, punitive damages are allowed as punishment and deterrence. They are not based upon the extent of the injuries, but rather upon the nature of the act and the amount necessary to punish and deter others from similar conduct. Lazenby v. Universal Underwriters Ins. Co., 383 S.W.2d 1, 4 (Tenn.1964). Punitive damages may be awarded, in the sole discretion of the jury, in cases of gross negligence. Inland Container Corp. v. March, 529 S.W.2d 43, 44-45 (Tenn.1975).[4]
 
 
 45
 The jury's award to Mrs. Lynch of $100,000 in punitive damages is not clearly unreasonable. We do not find that the district court abused its discretion in denying Dr. Bryant's motion for remittitur regarding Mrs. Lynch's compensatory and punitive damage awards.
 
 VI. The Contribution Issue
 
 46
 Finally, we consider whether the district court correctly granted Dr. Bryant's motion requesting a reduction of the total judgment against him by the full amount that the hospital paid Mrs. Lynch to settle. Pursuant to Fed.R.Civ.P. 59(e), Dr. Bryant filed a timely motion to amend the judgment of the district court. We agree with the district court's decision granting this motion.
 
 
 47
 After the jury had rendered its decision regarding the liability of Dr. Bryant and the hospital, and one day before the jury was charged on the issues of compensatory and punitive damages, Mrs. Lynch and the hospital reached a settlement agreement, (J.A. at 147), which required the hospital to make a lump-sum cash payment of $240,000 to Mrs. Lynch and to provide two annuities to be purchased by the hospital at a cost of $160,000. Of the total lump-sum payment, the parties allotted $10,000 to compensatory damages and the remainder, $230,000, to punitive damages. The purchase price of the annuities was also allocated as punitive damages.
 
 
 48
 The following day, March 18, 1985, it was announced in open court that all claims against the hospital had been settled. Therefore, the district court instructed the jury on the issue of damages only in regard to Dr. Bryant, and the jury subsequently awarded Mrs. Lynch the previously mentioned compensatory and punitive damages against Dr. Bryant.
 
 
 49
 Dr. Bryant, in his motion to alter or amend the judgment, claimed that pursuant to Tennessee's Uniform Contribution Among Tort-Feasors Act, Tenn.Code Ann. §§ 29-11-101 to -106 (1980) (the "Contribution Act"),[5] the judgment against him should be reduced according to the amount of the full settlement between Mrs. Lynch and the hospital, and the district court agreed. Mrs. Lynch claims that the district court erred in this decision. She admits that, under the Contribution Act, Dr. Bryant was entitled to a credit against his compensatory damage award for the amount the hospital paid Mrs. Lynch to settle the compensatory claims, but she argues that he was not entitled to a credit for any amount the hospital paid to settle the punitive damage claims against it. Mrs. Lynch contends that an award of punitive damages, being an award for the purposes of punishment and deterrence, is not a common liability shared by multiple tortfeasors. Thus, the Contribution Act should not apply to punitive damages.
 
 
 50
 Contrary to Mrs. Lynch's assertion, we do find that under the facts of this case the Contribution Act affects the jury's award of punitive damages. The Contribution Act was intended to provide a right of contribution to a tortfeasor who has paid more than his or her pro rata share of a common liability for which two or more individuals are jointly or severally liable. Dykes v. Raymark Indus., Inc., 801 F.2d 810, 813 (6th Cir.1986), cert. denied, 481 U.S. 1038 (1987). We expressly held in Dykes that settlement payments, including those characterized and allocated as punitive damages, reduce similar awards against non-settling defendants under the application of the Tennessee Contribution Act. Id. at 812-15. Dykes was a diversity case where the law of Tennessee was controlling. Id. at 812. The jury in Dykes awarded the plaintiff $300,000 in compensatory damages and $200,000 in punitive damages for personal injuries suffered by Mr. Dykes. Id. After a comprehensive review of the Tennessee Contribution Act, we concluded that the Act did apply to punitive damages based upon wanton or willful conduct. Id. at 819.
 
 
 51
 Section 29-11-102 of the Contribution Act defines the right of contribution among tortfeasors and it delineates certain exceptions to contribution. In Dykes, we construed this statute and determined that it did not expressly exclude punitive damages. Id. at 813. In fact, we found that the least forced interpretation of the statute was that it was intended to exclude damages for intentionally caused injury only. Id.; see also Tenn.Code Ann. § 29-11-102(c) ("There is no right of contribution in favor of any tort-feasor who has intentionally caused or contributed to the injury or wrongful death.").
 
 
 52
 In Tennessee, as the district court noted, punitive damages may be awarded for behavior other than intentional misconduct. The Tennessee Supreme Court stated in Inland, 529 S.W.2d at 45, that punitive damages could be awarded for fraud, malice, gross negligence, oppression, wilful misconduct, intentional misconduct, reckless behavior, and conscious indifference.[6] In this case, the punitive damage awards given to Mrs. Lynch, both in her individual and representative capacities, were based on a finding of gross negligence, not intentional misconduct. Therefore, since the Contribution Act only excepts intentionally caused injury, the punitive damage awards based on gross negligence are subject to its governance.
 
 
 53
 Mrs. Lynch, noting the "private fine" nature of punitive damages, see Dykes, 801 F.2d at 814, contends that this case is distinguishable from Dykes because, in this case, the settlement with the hospital occurred after the jury found both Dr. Bryant and the hospital liable. Thus, when the jury considered the issue of damages after the settlement with the hospital was announced, it was considering only Dr. Bryant's conduct. In Dykes, all the defendants but one settled before the jury reached a liability verdict. Id. at 812. Under those circumstances, we held that the apportionment of damages based on liability would have been pure speculation at best. Id. at 814. But here, Mrs. Lynch argues, apportionment would not be based on speculation since liability for all of the defendants had been determined and the jury was only considering the conduct of Dr. Bryant when it awarded punitive damages.
 
 
 54
 While we recognize the personal and private nature of punitive damages, the jury's sole consideration of Dr. Bryant's liability at the damages phase of the trial does not affect the application of the Contribution Act. Under the Contribution Act, the first question to ask is whether the settling defendant was sued as a tortfeasor. Rosenbaum v. First Am. Nat'l Bank, 690 S.W.2d 873, 879 (Tenn.Ct.App.1985). If the settling and non-settling defendants are named in the plaintiff's original complaint and the same damages are sought from both, then any liability of the non-settling defendant must be reduced by the amount paid by the settling defendant for the release or the covenant not to sue. Id. at 878. Whether the settling defendant was, in fact, guilty of tort is immaterial. Id.
 
 
 55
 In her complaint, Mrs. Lynch contended that Dr. Bryant and the hospital were liable for the injuries, and she sought non-allocated compensatory and punitive damages from both. Since the hospital was clearly sued as a tortfeasor, Dr. Bryant's liability must be reduced by the amount of the settlement agreement between the hospital and Mrs. Lynch. The Contribution Act makes no distinction as to the timing of a settlement, and this court may not read one into it.
 
 
 56
 Finally, Mrs. Lynch argues that there was ample evidence of intentional misconduct presented at the trial, which removes the applicability of the Contribution Act. The jury, however, found that Dr. Bryant's conduct constituted gross negligence, and we agree with the district court that this was a question of fact for the jury to decide.
 
 
 57
 Mrs. Lynch requested that we certify the issue of the proper interpretation of the Contribution Act to the Tennessee Supreme Court if we refused to distinguish our decision in Dykes from this case. We find this unnecessary. While the Tennessee Supreme Court still has not addressed the applicability of the Contribution Act to punitive damage awards, it has been five years since our decision in Dykes. If the State of Tennessee had been disturbed by our interpretation in Dykes, it seems reasonable that the legislature would have taken steps to clarify the matter. In the absence of contrary indication, we find Dykes controlling.
 
 
 58
 AFFIRMED.
 
 
 59
 KENNEDY, Circuit Judge, concurring in part and dissenting in part.
 
 
 60
 I concur in all of the per curiam opinion except the holding that expert testimony was not required to establish the standard of care required in the treatment of Mr. Lynch both with respect to the abandonment and gross negligence claims.
 
 
 61
 I agree with the panel that there are cases in which abandonment may be proved without expert testimony, but would find that under the circumstances here expert testimony was required with respect to whether Dr. Bryant had abandoned Mr. Lynch. There was no expert testimony or evidence that the standard of care of a physician who was not an orthopedic expert required anything more of Dr. Bryant. Dr. Bryant had told Mr. Lynch that he would only give immediate care. Mr. Lynch was at a hospital, not lingering at home or by the wayside. However, if I were to conclude that expert testimony was not required, I would concur with the panel that there is no evidence of abandonment here. I also believe the judge erred in not setting aside the negligence portion of the verdict on the representative claim. Again, there was no expert testimony that Dr. Bryant had failed to act with the appropriate standard of care. He had discharged Mr. Lynch. He was not told that Mr. Lynch was complaining of pain, only that the Lynchs were still in the hospital. The hospital employee admitted she had misinterpreted Dr. Bryant's orders. Whether Dr. Bryant was required to do anything more required expert testimony.
 
 
 62
 With respect to Mrs. Lynch's claims, there is the necessary expert testimony that she required further treatment and care. There is also Dr. Bryant's testimony that he continued to see her in making rounds. Thus, I agree with the panel that her claims could go to the jury.
 
 
 
 [1]
 Humana, Inc., however, was found not liable. See J.A. at 68-69. Humana of Tennessee, Inc., settled with Lynch after the jury's liability verdict was announced
 
 
 [2]
 Again, the jury found Humana, Inc., not liable
 
 
 [3]
 Applicable portions of Tennessee Code Annotated § 29-26-115 read:
 (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
 (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;
 (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
 (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.
 (b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a) unless he was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make his expert testimony relevant to the issues in the case and had practiced this profession or specialty in one of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.
 
 
 [4]
 We are aware that the Tennessee Supreme Court recently modified the scope of cases in which punitive damages are to be awarded in Tennessee. Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 900-01 (Tenn.1992). Specifically, the court held that punitive damages can be awarded if a defendant has acted either: (1) intentionally; (2) fraudulently; (3) maliciously; or (4) recklessly (i.e., a defendant "is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all circumstances"). Id. at 901. Furthermore, the court modified the evidentiary standard, formerly preponderance of the evidence, for the award of punitive damages. Recognizing that punitive damages are only to be awarded in the most egregious of cases, the court held that the plaintiff must prove the defendant's conduct by clear and convincing evidence. Id. Despite the Tennessee Supreme Court's pronouncement in Hodges that the noted changes were to be applied to all cases presently pending in the trial and appellate courts, see id. at 902, we decide not to attempt to apply the new case law to this case
 Both parties submitted their briefs for this case before March 1992; Hodges was handed down on April 20, 1992. Obviously, Hodges was not available to either party prior to the submission of their briefs. Oral argument for this case occurred on September 28, 1992. Between the time that Hodges was decided and the oral argument before this court, however, neither party attempted to amend its brief in light of Hodges. Furthermore, neither party mentioned Hodges and its potential applicability to the issue of punitive damages at the oral argument. Because of this five-month window of opportunity, we believe that Hodges was reasonably available to the parties for them to raise its holding as an issue in this case if either party had so desired. Issues touching on the jury's award of punitive damages were raised, but the specific issue of whether punitive damages may be awarded for gross negligence, for example, was not. Since neither party raised such issues, we find that they are not properly before this court, and decline to address them.
 
 
 [5]
 Tenn.Code Ann. § 29-11-105 (1980) reads in pertinent part:
 (a) When a release or covenant not to sue or not to enforce judgment is given in good faith to one (1) of two (2) or more persons liable in tort for the same injury or the same wrongful death:
 (1) It does not discharge any of the other tort-feasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of consideration paid for it, whichever is the greater....
 
 
 [6]
 But see supra note 4